IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No.: 4:16-CR-0056 |
| | : | |
| | : | (Judge Brann) |
| v. | : | |
| | : | |
| FRANK PONDER, | : | |
| MARVIN C. POLAND, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

### JUNE 9, 2017

I. BACKGROUND

Defendants Frank Ponder and Marvin C. Poland were charged by indictment on March 10, 2016.[1] A superseding indictment was docketed on May 11, 2017.[2] Both Defendants are charged in Count I, conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846; and Count II, distribution/possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1). A jury trial is scheduled for June 19, 2017.[3]

---

[1] ECF No. 9.
[2] ECF No. 56.
[3] In each of Defendant Ponder's several pre-trial motions and briefs he makes much of what he claims is the Court's unwillingness to permit him to enter a plea of guilty. Counsel misrepresents the facts. The Government offered Ponder a plea agreement. However, it was conditional on Defendant Poland also entering a plea. Poland has exercised his right to a jury trial, and consequently the Government will not sign a plea agreement with Ponder. Ponder

1

On May 23, 2017, Defendant Ponder filed a Motion "to Suppress all Evidence Resulting from the Illegal Stop of Frank Ponder's Vehicle" and contemporaneously filed a supporting brief.[4] Defendant Poland joined in Ponder's motion and brief.[5] The Government filed its opposing brief on May 31, 2017.[6] Attached to the Government's brief were two DVDs[7] of the traffic stop encounter filmed by the Pennsylvania State Police troopers' dashboard cameras.

An evidentiary hearing[8] on this motion was held on June 7, 2017. Both Defendants were present at the hearing; neither testified. Trooper Luke A. Straniere, who had stopped the vehicle and discovered the evidence, was present

---

decided to plea "open," that is to say, he was willing to plead guilty without the benefit of a plea agreement. A change of plea hearing was scheduled for May 10, 2017. On May 8, 2017, the Government filed an Information pursuant to 21 U.S.C. § 851, to establish prior felony convictions. The result of the May 8, 2017 Information was that it doubled the mandatory minimum term of imprisonment for Ponder. Despite this, Ponder still attempted to enter an open plea on May 10, 2017. That open plea hearing was aborted, as the transcript indicates, ECF No. 78, because I rejected Ponder's guilty plea to Count I, and counsel then advised the Court that she had recommended that Ponder not plead guilty to Count II. ECF No. 28 at 28-29. Counsel subsequently contacted my chambers on May 12, 2017 and indicated that she would like a change of plea hearing scheduled because although her client was not willing to admit the factual basis outlined in Count I, she had changed her argument as to why the Court should accept a plea of guilty to Count I. I did not schedule a plea hearing, as I determined and later explained in my May 12, 2017 Order, ECF No. 65, there would still not be a factual basis underlying Ponder's plea as required by Federal Rule of Criminal Procedure 11(c)(3).
[4] ECF Nos. 94 and 95.
[5] ECF Nos. 97 and 98.
[6] ECF No. 105.
[7] Both disks were entered into evidence at the hearing. Portions of the video of Trooper Luke A. Straniere's encounter with the Defendants was played. The video of Trooper Jeremy Hoy's encounter was not played during the hearing. Nevertheless, the Court is fully familiar with both videos as I had watched each disk twice prior to the suppression hearing. These were designated Government Exhibits 13.1 and 13.2. There was no objection from defense counsel as to the entry of the exhibits, other than the videos not be used in lieu of the trooper's testimony. The videos corroborate Trooper Straniere's recitation of events.
[8] The suppression hearing was open to the public. *See Waller v. Georgia,* 467 U.S. 39, 50(1984).

and testified. During the hearing, both the Government and Defense counsel had an opportunity to examine witnesses and present evidence. For the reasons that follow, I will deny the motion.

## II. DISCUSSION

Pennsylvania State Police[9] Trooper Straniere,[10] is a trooper in the Shield Unit stationed at the North Central barracks in Bellefonte, Pennsylvania.[11] As I noted above, Trooper Straniere testified at the June 7, 2017 suppression hearing. I found Straniere to be a credible witness. Trooper Straniere testified as to his training and experience. He was, of course, trained initially at the PSP police academy.[12] Since that time, has attended 400 hours of additional training, including drug training, hidden compartments in vehicles, and indicators of criminal activity.[13] He also teaches for the "SHIELD" program for the PSP.[14] He has spent his entire professional career, the past ten and one-half-years, on highway patrol.[15]

On March 2, 2016, Trooper Straniere was in uniform and operating a marked PSP patrol car, known as "Shield 9," monitoring westbound traffic near mile marker 218 on Interstate 80 in Northumberland County, Pennsylvania. Shortly

---

[9] Hereinafter "PSP."
[10] Hereinafter "Straniere" or "Trooper Straniere" or "the trooper."
[11] Trooper's testimony at June 7, 2017 suppression hearing.
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

3

after 11 a.m, while in his stationary patrol vehicle observing traffic, Trooper Straniere saw a dark blue Lincoln MKZ, which he described as a "high-end rental vehicle," drive past his location.[16] He was unable to fully see the driver as the driver's seat was substantially reclined.[17] Trooper Straniere pulled out onto Interstate 80 and observed the vehicle in the left lane actively passing vehicles in the right lane.[18] The trooper followed the vehicle in the left lane for a half a mile and clocked and recorded its rate of speed as 75 miles per hour in a 65 mile per hour zone.[19] The trooper measured the speed of the Defendants' vehicle based on his own calibrated speedometer; he was not operating "VASCAR" or another radar at the time.[20] The Lincoln MKZ suddenly braked, merged into the right lane, and remained at a distance of only one car length behind a tractor-trailer for approximately two-tenths of a mile.[21] In his testimony, Trooper Straniere described the Defendants' vehicle as "tucked-in" behind the tractor-trailer.[22] The Defendants' vehicle followed the tractor-trailer off exit number 215, maintaining

---

[16] ECF No. 94-1 at 3 and testimony at June 7, 2017 suppression hearing.
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] Trooper's testimony at June 7, 2017 suppression hearing.
[21] ECF No. 94-1 at 3 and testimony at June 7, 2017 suppression hearing.
[22] Trooper's testimony at June 7, 2017 suppression hearing.

the same following distance.[23] Trooper Straniere followed the vehicle off the exit.[24]

Trooper Straniere then turned on his lights and siren and pulled the subject vehicle over in the parking lot of the Flying J truck stop.[25] Trooper Straniere approached the passenger side of the vehicle and the driver said to him: "What's going on big guy?"[26] The trooper asked for the driver's license, registration, and insurance.[27] The driver responded, "How are you doing today?"[28] The trooper asked where they were headed, and the driver responded that they were going to Williamsport for work.[29] Trooper Straniere found this to be "strange because the exits for Williamsport were several miles down at exit 212 and 210."[30] Trooper Straniere "noticed the front seat passenger," who "had a bag of blue prints on his lap that he was shuffling through," "failed to make eye contact and looked at his lap."[31] Trooper Straniere asked the driver if he owned the vehicle, and the driver advised the trooper that it was a rental and handed Trooper Straniere the rental agreement together with his identification.[32] The driver asked why he was stopped,

---

[23] ECF No. 94-1 at 3 and testimony at June 7, 2017 suppression hearing.
[24] *Id.*
[25] ECF No. 94-1 at 4 and testimony at June 7, 2017 suppression hearing.
[26] *Id.*
[27] ECF No. 94-1 at 4.
[28] *Id.*
[29] ECF No. 94-1 at 4 and testimony at June 7, 2017 suppression hearing.
[30] ECF No. 94-1 at 4.
[31] ECF No. 94-1 at 4 and testimony at June 7, 2017 suppression hearing.
[32] *Id.*

5

and Trooper Straniere related that he was traveling at 75 miles per hour in a 65 mile per hour zone, and for following another vehicle too closely.[33] The trooper asked the driver for his address but couldn't hear the answer, so he asked to speak with the driver at the rear of the vehicle.[34]

Trooper Straniere explained that he engages in a "rapid assessment" at each traffic stop.[35] He further explained that separating the occupants helps him make this "rapid assessment."[36] He also testified that he found Defendant Ponder's demeanor to be "overly friendly," and that Defendant Ponder was acting like "Mr. Congeniality."[37]

The driver exited the vehicle and consented to a pat down.[38] Trooper Straniere ran the occupants' information and identified the driver as Frank Ponder and the passenger as Marvin C. Poland.[39] Defendant Ponder related that he was an electrician and told the trooper that he liked "the AR" "referring to [the] patrol rifle in the gun rack between the front seats."[40] Trooper Straniere asked Ponder "if he had one and he laughed and said, "No, my brother is in the military."[41] "Ponder

---

[33] ECF No. 94-1 at 4.
[34] ECF No. 94-1 at 4 and testimony at June 7, 2017 suppression hearing.
[35] Trooper's testimony at June 7, 2017 suppression hearing.
[36] *Id.*
[37] *Id.*
[38] ECF No. 94-1 at 4.
[39] *Id.*
[40] ECF No. 94-1 at 4 and testimony at June 7, 2017 suppression hearing.
[41] ECF No. 94-1 at 4.

related they were going to look at a job and see a friend and going with the blue prints they had."[42] Defendant Ponder and Trooper Straniere then had a conversation about cigarettes Defendant Ponder saw in the trooper's glove box.[43] Trooper Straniere "asked [Ponder] how long he had been an electrician and he said he started in 2008."[44] The trooper next wrote in his report, "he told me about his schooling and then said, "That's where the money is at."[45] Trooper Straniere "asked him where the money was and he laughed and said in electricians."[46]

Trooper Straniere next wrote in his report, "due to the indicators present, I sent a message to Trooper Hoy and advised he respond to my location."[47] The trooper then asked Ponder how long Poland had been an electrician and Ponder replied for over 20 years, but that he was a better electrician than Poland.[48] Trooper Straniere "asked if he was going back to Philly later in the day and he said yes without a doubt."[49] "He related that he was just looking at this stuff for someone trying to open a club."[50] The trooper asked where, and Ponder replied "Williamsport."[51] Straniere asked where, and Ponder replied "Umm south east I think, I have it on

---
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.* at 5.
[47] ECF No. 94-1 at 5 and testimony at June 7, 2017 suppression hearing.
[48] ECF No. 94-1 at 5.
[49] *Id.*
[50] *Id.*
[51] ECF No. 94-1 at 5 and testimony at June 7, 2017 suppression hearing.

my phone, you know my phone."[52] "He then stated he didn't know if the person opening the club was going to get approved so they were just going to look at it."[53] "They had a big job going in Philadelphia and that's what the blue prints were in the vehicle."[54]

Defendant Ponder next told Trooper Straniere that "his ex used to be a state trooper."[55] The trooper asked who, and Ponder replied, "Antwana Murphy."[56] Trooper Straniere "immediately recognized the name because [he] had worked in the southeast area around Philadelphia for most of [his] career."[57] "She had worked in the Philadelphia area as well."[58] Trooper Straniere "knew that she had been fired for several incidents, the majority of which were inappropriate contact/conduct with felons."[59] Trooper Straniere asked Defendant Ponder, "Didn't she get fired?"[60] Defendant Ponder replied that she had, and had sued.[61] He further explained that she was working in New Jersey following employment at Temple University.[62] Trooper Straniere "felt it was strange for him to mention

---

[52] *Id.*
[53] ECF No. 94-1 at 5.
[54] *Id.*
[55] ECF No. 94-1 at 5 and testimony at June 7, 2017 suppression hearing.
[56] ECF No. 94-1 at 5.
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] *Id.*

8

being related to a trooper that had been fired, but also viewed it as a disclaimer as trying to assure me that he was a good person."[63]

In his patrol vehicle, Trooper Straniere "ran" the occupants' driver's licenses through the "CLEAN NCIC" database to determine their respective criminal histories.[64] "During the conversation [Straniere] learned that Ponder had a suspended driver's license…and both had extensive criminal histories for drugs."[65] Defendant Ponder asked if he was going to get a ticket, and Trooper Straniere responded that he would give him "a warning if everything was good with his license."[66] Trooper Straniere asked Defendant Ponder if he had a "good license, without points or suspensions and he said yes."[67]

Approximately ten to fifteen minutes into the encounter Trooper Hoy arrived on the scene.[68] Trooper Straniere gave Trooper Hoy a 'thumbs up' which was the signal that "this is a good stop that [Straniere] was going to attempt to search."[69] Trooper Straniere approached Defendant Poland and asked for his address.[70] The trooper testified that Defendant Poland did not make eye contact with Straniere

---

[63] ECF No. 94-1 at 5.
[64] Trooper's testimony at June 7, 2017 suppression hearing.
[65] ECF No. 94-1 at 5 andtestimony at June 7, 2017 suppression hearing.
[66] *Id.*
[67] ECF No. 94-1 at 5.
[68] Trooper's testimony at June 7, 2017 suppression hearing.
[69] ECF No. 94-1 at 5 and testimony at June 7, 2017 suppression hearing.
[70] ECF No. 94-1 at 5.

during the initial interaction.[71] Defendant Poland "began stuttering and [Straniere] could see his chest heaving and he was extremely short of breath."[72] Defendant Poland failed to look at Trooper Straniere while answering and responded that his address was 2009 East Cambria Street.[73] The trooper noted that his address was actually 2007 East Cambria Street, and "felt this was indicative of his extreme nervousness that he had provided an incorrect address."[74] Trooper Straniere testified that it is unusual for the passenger of a vehicle that has been pulled over to be nervous throughout the entire encounter.[75] He explained that usually the passenger finds it humorous for the driver to be pulled over, because the driver would be at fault, not the passenger.[76]

Trooper Straniere asked Defendant Poland where they were headed and Poland replied that they were going to Williamsport to see Defendant Ponder's cousin.[77] Defendant Ponder had "never mentioned anything about visiting a cousin."[78] Trooper Straniere asked Defendant Poland about his occupation and Poland replied that he was an electrician.[79] Trooper Straniere asked how long they were going to

---

[71] Trooper's testimony at June 7, 2017 suppression hearing.
[72] ECF No. 94-1 at 5.
[73] *Id.* at 6.
[74] *Id.*
[75] Trooper's testimony at June 7, 2017 suppression hearing.
[76] *Id.*
[77] ECF No. 94-1 at 6.
[78] *Id.*
[79] *Id.*

visit the cousin.⁸⁰ Defendant Poland "had a blank scare [sic] look on his face and his chest continued heaving and [he] failed to answer."⁸¹ Defendant Poland still had the blue prints on his lap.⁸² Trooper Straniere said "You aren't working in Williamsport right?"⁸³ Defendant Poland replied "No, no, no" and explained that "they were going to visit someone to see if they needed electric work done in their house."⁸⁴

While speaking with Defendant Poland, Trooper Straniere smelled the odor of marijuana.⁸⁵ He gave a second thumbs up signal to Trooper Hoy and returned to his patrol vehicle.⁸⁶ While returning to his vehicle, Trooper Straniere looked through the rear window of the rental vehicle and saw a spray bottle of air freshener on the floor along with some electrician's tools.⁸⁷ Defendant Ponder saw the trooper looking through the windows and asked Trooper Straniere if he wanted to look inside the car.⁸⁸ Straniere returned to his vehicle and Defendant Ponder followed.⁸⁹ The trooper noted that during most of the conversation Defendant Ponder was looking around Trooper Straniere's vehicle and smiling, but when the

---

⁸⁰ *Id.*
⁸¹ *Id.*
⁸² *Id.*
⁸³ *Id.*
⁸⁴ *Id.*
⁸⁵ ECF No. 94-1 at 6 and testimony at June 7, 2017 suppression hearing.
⁸⁶ *Id.*
⁸⁷ *Id.*
⁸⁸ *Id.*
⁸⁹ ECF No. 94-1 at 6.

11

trooper asked Defendant Ponder if "he had anything illegal inside his vehicle he said no sir[;] he did not smile and looked briefly at his vehicle."[90] Trooper Straniere asked if he could search Defendant Ponder's vehicle and Ponder replied "Go ahead."[91] Defendant Ponder went so far as to use his keys to remotely open the trunk/rear hatch.[92]

Trooper Straniere told Trooper Hoy that he had smelled marijuana[93] while speaking with Defendant Poland and that Poland's chest had been heaving.[94] Trooper Straniere then approached Defendant Poland and asked if he had anything illegal with him and Poland shook his head 'no.'[95] "His eyes were wide open and he had a scared expression on his face."[96] Trooper Straniere asked why he smelled marijuana and Poland "could not answer."[97] Defendant Poland consented to a pat down search for weapons, which revealed none.[98] Trooper Straniere asked if Defendant Poland had anything down his pants "and he patted himself down and said, 'Maybe a little piece of roach in my pocket.'"[99] "He pulled a small marijuana roach/joint out of his pocket and attempted to hand it to" Trooper Straniere, who

---

[90] *Id.*
[91] *Id.*
[92] *Id.*
[93] Trooper Straniere testified that he had been trained by the PSP on the smell of marijuana.
[94] ECF No. 94-1 at 6 and testimony at June 7, 2017 suppression hearing.
[95] *Id.*
[96] ECF No. 94-1 at 6.
[97] *Id.*
[98] *Id.*
[99] ECF No. 94-1 at 6 and testimony at June 7, 2017 suppression hearing.

told him to hold it and stand with Ponder.[100]  Trooper Straniere testified that he did not take the "roach" from Poland, who subsequently threw it over the guardrail.[101]  It was never seized as evidence.[102]

Trooper Straniere then began the search of the vehicle.[103]  He eventually climbed into the trunk and removed its floor panel.[104]  Trooper Straniere saw a clear plastic bag containing a powdery substance that he recognized to be either heroin or cocaine.[105]  He next exited the trunk and told both Defendants Ponder and Poland to put their hands behind their backs.[106]  Trooper Straniere retrieved the plastic bag and on examination of it recognized the substance as heroin.[107]  Trooper Straniere patted down Defendant Ponder and found approximately $900 in cash in Ponder's pocket.[108]  Trooper Hoy took Defendant Poland to his vehicle for transport to the state police barracks and Straniere took Ponder with him.[109]

---

[100] ECF No. 94-1 at 6.
[101] Trooper's testimony at the June 7, 2017 suppression hearing.
[102] *Id.*
[103] ECF No. 94-1 at 6 and testimony at June 7, 2017 suppression hearing.
[104] *Id.*
[105] *Id.*
[106] *Id.*
[107] *Id.*
[108] ECF No. 94-1 at 6.
[109] *Id.*

13

Trooper Straniere seated Defendant Ponder in the rear of the police vehicle and "mirandized" him.[110] Defendant Ponder declined to speak with Straniere after that, other than to relate that the heroin "wasn't his."[111]

A subsequent laboratory test of the substance in the bag indeed revealed that the substance was heroin.[112] The evidence was turned over to agents from the Federal Bureau of Investigation pending the instant criminal proceedings.[113]

Defendant Ponder, joined by Defendant Poland, argues that the Fourth and Fourteenth Amendments to the United States Constitution require that the evidence at issue here be suppressed. The Fourth Amendment states "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Section 1 of the Fourteenth Amendment states "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall

---

[110] ECF No. 94-1 at 6 and testimony at June 7, 2017 suppression hearing.
[111] ECF No. 94-1 at 6.
[112] *Id.*
[113] *Id.*

any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Defendant Ponder argues that the vehicle stop and subsequent search were constitutionally violative because there was no probable cause or reasonable suspicion of a traffic violation.[114] Specifically, Defendant Ponder contends that he was not speeding, but rather was travelling at 65 miles per hour. He also contends that he was not following too closely in violation of 75 Pa.C.S.A. § 3310.[115]

The late Justice Antonin Scalia writing for a unanimous United States Supreme Court in *Whren v. United States*, explained that "an automobile stop is [] subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."[116] "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."[117]

The United States Court of Appeals for the Third Circuit has further expounded on this principle, in case written by Judge D. Michael Fisher who stated that "in *Whren v. United States,* the Supreme Court established a bright-line rule

---

[114] ECF No. 94 at 4.
[115] ECF No. 94 at 4 and ECF No. 95 at 4-5.
[116] 517 U.S. 806, 810 (1996).
[117] *Id.* (internal citations omitted).

15

that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime."[118] *Whren* stated "subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis," and made it patently clear that the Court's prior precedent "foreclose[d] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved."[119]

Here, the defense, despite the opportunity to do so at the evidentiary hearing, set forth no evidence that Defendant Ponder was traveling at a rate of 65 miles per hour or was not "following too closely" in violation of the Pennsylvania Vehicle Code. Defendant Ponder did not testify nor did he present any evidence to support his contention. The only support for his argument is his counsel's assertions without evidentiary support. Trooper Straniere's report states he clocked the Lincoln MKZ travelling at a rate of 75 miles per hour; his credible testimony during the June 7, 2017 hearing corroborated his report. Additionally, his testimony and report support a finding of the offense "following too closely." There is no reason to find otherwise. Accordingly, I find that the stop was reasonable and not constitutionally violative.

---

[118] *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (Fisher, J.).
[119] *Whren* at 813.

In the matter at hand, Defendant Ponder cites to pre-*Whren* case law to argue that Trooper Straniere's stop of Ponder's vehicle was merely pretextual.[120] Counsel cites to three Tenth Circuit cases that all predate *Whren* for her pretext argument.[121] However, not only did Judge Fisher in *Mosley* write that "in *Whren v. United States*, [], the Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime;"[122] he also wrote in the preceding sentence: "When one peruses the traffic-stop suppression caselaw, one is struck by how rarely a traffic stop is found to have been illegal."[123] Defendant's Ponder's arguments that the stop was pretextual are of no moment. *Whren* clearly states that because a traffic violation occurred, which I have duly found after an evidentiary hearing, the trooper's subjective motivations in making a stop are irrelevant.

Turning then to the Defendants' consent argument, I note that it was fourteen years ago that the late Chief Judge Edward R. Becker, writing for the United States Court of Appeals for the Third Circuit stated:

> First, the Third Circuit case that White cites, *United States v. Johnson*, 63 F.3d 242, 247 (3d Cir.1995), predates *Whren v. United States*, 517

---

[120] ECF No. 95 at 4.
[121] *See,* Def. Br. ECF No. 94 at 4., *citing United States v. Guzman,* 864 F.2d 1512, 1515 (10th Cir. 1988); *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995); *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir. 1989).
[122] *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006).
[123] *Id.*

17

U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). *␣Whren* resolved a question that was open at the time of *Johnson* (and was central to the portion of *Johnson* that White cites), i.e., whether an officer's subjective intent is relevant to finding a Fourth Amendment violation. *Whren* held that it is not. Moreover, even if *Johnson* were still the leading case, White does not characterize it accurately in his brief. *Johnson* in fact is quite skeptical of a subjective component in Fourth Amendment traffic stop analysis. In simple terms, an officer certainly may ask-incident to a lawful traffic stop-for consent to search based on a hunch, or indeed, on nothing at all. Thus, White fails as a matter of law to establish the predicate that the request for consent to search was unlawful.[124]

I find that the search in this case was consensual. At minute 13:12 of the DVD from Trooper Straniere's dashboard camera, at 11:22 a.m. on March 2, 2016, the trooper asked Defendnat Ponder "Can I search your vehicle?" and Ponder responded "Go ahead." Eight seconds later the video shows the trunk of Ponder's vehicle opening because Ponder had remotely opened the trunk with his keychain. "[A]n officer certainly may ask -- incident to a lawful traffic stop -- for consent to search based on a hunch, or indeed, on nothing at all."[125] "Thus, [Ponder and Poland] fail as a matter of law to establish the predicate that the request for consent to search was unlawful."[126]

---

[124] *United States v. White*, 80 F. App'x 230, 231 (3d Cir. 2003).
[125] *Id.*
[126] *Id.*

## III. CONCLUSION

Having concluded that the stop of the vehicle was lawful and the search of the vehicle was consensual, Frank Ponder's suppression motion, which has been joined by Marvin Poland, will be denied.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge